Moncure, P.
This is a suit for the specific execution of a contract for the sale of a tract of land. On the llth day of February, 1868, McGannon and Bennett, *then residents of the city of Wheeling, in West Virginia, and owners of a tract of land, estimated to contain 800 acres, more or less, lying partly in Frederick county, Virginia, and partly in Morgan county, West Virginia, and recently before, to-wit: in the next preceding month of January, 1868, purchased by them of McIntyre’s heirs, contracted with Robert White, then also a resident of the said city of Wheeling, to sell to Frances White, wife of the said Robert, 200 acres of the said tract, to be taken off the southern end thereof; to convey to her all rights they had to the said portoin of the said tract; to give possession of the same as soon as they received it from their vendors, only reserving the crop of wheat then growing thereon, with the right to gather and save the same; to have the land surveyed, and to execute a deed with general warranty to the said Frances White for the same; in consideration of which it was agreed that the said Frances should pay to the said McGannon and Bennett the sum of $6,500, to-wit: $3,025, part thereof, in cash, and the residue, $3,475, in three equal annual payments, for which she was to execute her bonds, payable in one, two and three years from the said date, with interest from said date, and should execute a deed of trust to secure the deferred payments. Accordingly the said cash payment of $3,025 was made; possession of the said land was delivered to the said White and wife, who removed to the same about the 1st of March, 1868, and have ever since resided thereon. A survey was made on the 14th of April, 1868, and a deed was executed by the said McGannon and wife and the said Bennett, bearing date the 10th day of April, 1869, which was duly acknowledged and certified for record, and tendered to the said Frances White, conveying the said land to her with general warranty of title. But she refused to receive *513 the said deed, and refused to make the lirst *deferred payment for the said land when it became payable; in consequence of which the said McGan-non and Bennett brought this suit against the said White and wife in the circuit court oí Frederick county to enforce the specific performance of the said contract. Let it be here remarked that the vendors have been guilty of no default in the performance of their part of the contract, which is always a circumstance in favor of a party who invokes the aid of a court of equity to enforce specific performance. The defendants, in their answer, relied on alleged inadequacy of consideration and fraud and misrepresentation in the sale, as the grounds on which they had refused to perform the contract on their part, and on which they claimed that the court ought not to decree the specific execution of the same, but ought even to decree its rescission; and it was agreed by the parties, by counsel, in the cause, that it should be considered by the court as if the defendants had filed their cross-bill, making the allegations contained in their answer, and praying a rescission of the said contract, and the plaintiff had answered said cross-bill, denying the allegations on which said relief of rescission was asked, and there had been a general replication to said answer. Many depositions were taken in the cause on both sides, among which were the depositions of the said McGannon and Bennett on the side of the plaintiffs, and the depositions of the said Robert White and wife on the side of the defendants; and on the 33d of August, 1870, a decree was entered for the specific execution of the said contract. From that decree the said White and wife applied for and obtained an appeal from this court.
But afterwards, to-wit: in October, 1873, when the said appeal came on to be heard in this court, it appearing to the court that the said decree appealed from was rendered in vacation, before the passage of the act approved *January 14, 1873, entitled “an act to authorize decrees in chancery causes to be entered by consent of parties in vacation, and to validate decrees heretofore rendered in vacation,” (Session Acts of 1873-73, p. 18, eh. 2G) ; and the parties against whom said decree was made not having, either in this court or the court below, entered of record, according to the proviso contained in the second section of said act, a waiver of all objection to the validity of such decree on account of its having been made in vacation: Therefore, without deciding other questions arising in the cause, it was decreed and ordered by this court that the said decree was invalid and be set aside, reversed and annulled; that the appellees pay to the appellants their costs by them expended in the prosecution of the said appeal; and that the said cause be remanded to the said circuit court for further proceedings to be had therein according to law; which was ordered to be certified to the said circuit court, and the same was accordingly so certified and entered of record in said court.
After the cause was remanded to the said circuit court, further proceedings were had therein in the said cause, including the taking of sundry other depositions in behalf of the appellees; and on the 5th day of April, 1875, the cause came on to be heard in the said circuit court, which thereupon made a decree refusing to rescind the contract referred to in the bill, and directing its specific execution. From and to the last-mentioned decree the said White and wife applied for and obtained an appeal to this court, and a supersedeas; which is the case we now have under consideration.
As before stated, there are two, and only two, grounds relied on to show that the contract ought not to be specifically executed, and ought even to be rescinded; and they are: first, inadequacy of consideration; and, secondly, *fraud and misrepresentation in the sale. I will proceed to inquire whether, on either of these two grounds, or both of them together, the de-fence relied on by White and wife ought to be sustained; and,
First. As to the alleged inadequacy of consideration.
It was held by this court, in the recent case of Hale v. Wilkinson, 21 Gratt. 75, that specific performance of a contract for the sale of land will not be refused on the sole ground of inadequacy of price, unless it be so great as to shock the moral sense, and thus be in itself evidence of fraud. A fortiori, such a contract will not be rescinded on that sole ground, unless the inadequacy of price goes at least to that extent. The question therefore is, whether there was such an inadequacy of consideration in this case, if the consideration can be properly said to have been inadequate at all; for no consideration of any value at all, upon which parties capable of contracting with each other, and in the absence of fraud, may agree, can be said, in a legal sense, to be inadequate.
All the testimony in the cause in regard to the value of the land tends to show that it was actually worth much less per acre than the price stipulated to be paid for it in the contract aforesaid, to-wit: thirty-two dollars and fifty cents per acre. But most of the testimony applies to the time at which it was given, when land in the neighborhood was much lower than at the time of the sale; though some of it applies also to the time of the sale. Of course, the value of the land at the time of the sale is the only material subject of inquiry in regard to such value.
The value of the land varies very widely, according to the testimony of the different witnesses, fluctuating between the extremes of six and fifteen dollars per acre. Some of the defendants’ witnesses estimate it as high as ^fifteen dollars per acre; which is little less than half of the price at which it was sold by the plaintiffs. Perhaps, according to an average of the estimates of the witnesses, the value of the land would he about twelve dollars per acre.
But all the witnesses evidently testified as to the opinion entertained by them at the time they gave their testimony in regard to *514 :the actual value of the land, either at that time or at the time of the sale, and not in regard to the price it would bring in the market at the time of the sale. We all know that •shortly after the war, and especially during the years 1866 and 1867, there was a great influx of immigrants to Virginia, at least to many portions of it, and that the price. of-lands in those portions, during that period, was greatly enhanced beyond the actual value of 'such lands. In every town, and,, almost every county, to which this tide of immigration was directed, there were “land agents” or “land brokers,” whose sole or chief business it was to negotiate sales of land between our people and the' new settlers among them. ■The county of Frederick, in which the land in controversy partly lies, was one of the portions of .the state to which these new settlers came; and there were, according to the testimony, as many as twenty or twenty-five real estate agents in the town of Winchester alone, after the close of the war, engaged in the business of negotiating sales. The witness who gav.e this testimony, and who had himself been a real estate agent from the close of the war, said he never knew of a real estate agent in business in Winchester before the war. The same witness said (he gave his testimony in April, 1870), “lands have been fluctuating very much, until recently. I have sold and resold various tracts of land. I have resold most of them at an advance on the first sale; some of them at a loss.
Purchasers have been mostly *from Pennsylvania and New York, and other northern states. The business has been more of a speculative character than anything else. Lands have been fluctuating much more than they did before the war, and some of them have sold for two or three times as much as they did before the war; that is, slate or cheap lands. Good lands have not fluctuated so much in price.” Being asked, “Can you illustrate this character of the business by any examples now in your memory?” he answered: “I could illustrate it in several instances if I could just think, but I don’t recollect just now. The Jones’ tract was sold at a considerable advance in a short time. I sold it the last time for about $18,000; it had been sold previous to that for about $10,000 or $12,-000. I sold this Baker farm out here; it was sold in 1867, I think, for $50 per acre. I sold it twice since; the last time for upwards of $60 per acre. I sold a small farm near Newtown, of Baker’s, for $1,500; I resold it the same week for $2,000.”
Such was the inflation of prices during the period and for the cause aforesaid, that our people did not know where it would end, or at what price to fix their lands in offering them for sale. There was danger of fixing them at too. low a price, and thus incurring a sacrifice, as the owners supposed. It was said in the argument that the land in question was not within the range of this speculating business. It is slate land, and the witness aforesaid stated that slate lands sold during the period aforesaid for two or three times as much as they did before the war, and it was in, or partly in; the county of Frederick. This very witness, as land agent, about the 1st of January, 1868, sold the McIntyre farm, estimated to contain about 800 acres, of which the land in question formed a part, to the plaintiffs, McGannon & Bennett, for $10,000, being at the rate of $12.50 per acre. ^Though the land was sold to them as being estimated to contain 800 acres, more or less, yet it is mentioned in the agreement with White as containing only 600 acres; it appears from the plat in the record to contain 624 acres, and’ it was assessed for taxation only as .591*4 acres. When the sale was made to White the vendors did not know that the quantity would exceed 600 acres. Had that been the true quantity the vendors would have given $16.66^j per acre — that is, more than one-half of the rate at which they sold the choice fourth of the farm, with all the improvements thereon, to White. That whole farm was assessed for taxation for the year 1868, only at $3,161.36 — less than one-third of the price at which it had, only the year before, been sold to the plaintiffs! Suppose they had refused to perform their contract on the ground of inadequacy of consideration, would a court of equity have sustained them in such refusal on that ground' only? I imagine not. And yet there would have been at least as much reason in so sustaining them as there would be in sustaining a similar refusal of the defendants' in this case. There is a -greater difference between the price they gave and the assessed value of the land, than there is between the price their vendees agreed to give to them and the price which they; the vendors, gave for the land, in the same proportion.
I make these observations upon the idea that the 200 acres of land in controversy are of the same proportionate value as the residue of the McIntyre farm. But who can say from the record in this case, what is the relative value per acre of these two portions of the farm? The evidence does' not show what is that relative value, but it does strongly tend to show that the portion sold to the defendants is of greater, and probably much greater relative value than the residue of the farm. The defendant, Robert White, chose the southern portion of the farm, ’"including the most valuable, if not the only valuable, improvements upon it, and including the rich lots around the buildings. Who- can say, looking to the comparative value of the two portions of the fkrm, and to the fact that the defendants bought but one-fourth of it, with all, or nearly all the improvements of the whole tract on the part they purchased, that the price they agreed to give per acre for the land, was much, if any greater, (looking to the comparative value of the two portions), than the price paid for the whole farm by their vendors just a month before? But surely those vendors, though non-residents, had the same right to fix their own price upon their own land that everybody who owned lands around theirs had, and was daily exercising or not at pleasure. And if that price, under the *515 influence of the views and opinions which generally prevailed at that time in regard to the prospective value of real estate in this section of country, was greatly inflated beyond the actual-value of the land, can it be said that the consideration of a sale made at that price is therefore so inadequate that a court of equity should refuse, on that ground alone, to execute the contract? Could any of the sales of land made by any of our people in this section of country during the period aforesaid stand the test of such a doctrine as that? Since that period land in the said section (f mean the section to which immigration has been tending as aforesaid) has greatly fallen in price, and has perhaps fallen even below the price which was usual before the war. Indeed, it has been difficult since to sell such land at any price. Immigrants who bought such land during that period, at the inflated prices of the time, have in many cases been glad, after paying large portions of the purchase money, to return the land to their vendors in consideration of being released from the payment of the balance due. Suppose, instead of *maldng such arrangements, they had resisted the demands of their vendors for a specific execution of their contracts upon the ground of inadequacy of consideration; and had proved, as they easily might have done, and as was done in this case, that the actual value of the land was greatly less than the price they agreed to give for the same; would their defence have been sustained by our courts? I think clearly not; and for the same reason I think that the defence in this case on the ground of inadequacy of consideration, taken by itself, is clearly insufficient. I now proceed to inquire whether upon any other ground, either taken by itself or in connection with the supposed inadequacy of consideration, a court of equity ought to rescind the contract, or even to refuse to enforce its specific execution. But one other ground of defence is relied on, and that is fraud and misrepresentation in the sale. I therefore proceed to inquire:
Secondly. As to the alleged fraud and misrepresentation.
it is not alleged in the answer, nor attempted to be proved by any testimony, nor is there anything in the record tending to show that the defendant, Robert White, who made the purchase for his wife and alone acted for her in the transaction, was not perfectly competent to make such a contract, or that any confidential relation existed between him and the plaintiffs, or either of them, or that he was ill any manner under the influence of them or either of them. All the parties, plaintiffs and defendants, resided in the same place, to-wit: the city of Wheeling; though they seem to have been almost totally unacquainted with each other prior to the negotiations between them for the sale of the land in controversy. Robert White had never, I believe, seen, and certainly was wholly unacquainted with one of them, Bennett, and was very slightly, if at all, acquainted with the other, McGannon.
^Neither of them, McGannon and Bennett, appears to have been at any time a land agent or speculator. One of them, Mc-Gannon, was by trade a butcher, and engaged in that business at the time of the sale in question; and the other, Bennett, was engaged in the business of shipping goods at a railroad depot in Wheeling. It does not appear what had been the occupation of Robert White. All these parties seem, at the same time, to have been imbued with the then prevailing desire in the northern and other neighboring states and cities, to emigrate to Virginia or some other southern state, and McGannon and Bennett, about the 1st of January, 1868, united in purchasing from Hancock, a laud agent in Winchester, the McIntyre farm aforesaid, estimated to contain 800 acres, more or less, for the sum of $10,000. They no doubt bought this farm with no view to speculation, or of reselling it or any part of it, but with a view of dividing it between them and removing to and residing upon it; and they did actually, soon afterwards, divide the remainder of it, after deducting portions resold by them to the defendants and others, between themselves, and have ever since, so far as the record shows, resided upon it. It does not appear, nor is it probable, that they had ever seen the land before they made the purchase. They left it a day or two after they made the purchase; and never saw it again until they returned to it with Robert White about a month afterwards, for the purpose of selling' a portion of it to him, if, after his seeing it, they could agree upon the terms. When they bought it it was covered with snow, and they saw little of it. One of them, Bennett, was not upon the land at all before the sale to White. They no doubt bought it, and mainly upon the representations of others, one of which others said the pricq of it was $17,000, but it could perhaps be bought for less. When they succeeded iti buying it for *$10,000 they doubtless supposed they had made a great bargain, though the price they gave for it was more than three times the assessed value of the land. Shortly after they returned to their homes in Wheeling Robert White, who it seems had sold his house in that city and wished to move with his wife and children to the country, hearing in some way, but how does not appear, that McGannon and Bennett had purchased the McIntyre farm, and might be willing to sell part of it, called on McGannon at his house and proposed to purchase a part of the farm. McGannon could not say whether such a purchase could be made without seeing his partner, Bennett, and told White to call again. After McGannon had seen Bennett and White had called again, it was agreed between them that a sale of a portion of the land would be made to White, if, after his seeing the land, they could agree upon the terms. It was accordingly arranged that all three of them would go out and see the land, and ascertain whether such an agreement could be made; and in a week or two thereafter they went out together by railroad to Martinsburg, and thence in an ambulance to *516 the land; where, after seeing it, they made the contract in question on the 11th of February, 1868. Possession of the land was delivered to the purchaser, who made the cash payment of $3,025, moved with his family to the land about a month thereafter, and has ever since resided thereon. A survey was made of the land, according to contract, in April, 1868, in the presence of White, who then made no objection to it.
Now, what I have thus far stated are facts of the case about which there seems to be no dispute; and taking them to be all the facts of the case, they certainly afford no foundation for any charge of fraud or misrepresentation in the sale.
*But the answer alleges that certain fraudulent misrepresentations were made by McGannon to Robert White in regard to the land, before the parties went from Wheeling to see it; and also by both McGan-non and Bennett, while they were upon the land;-on the'faith of which representations said White says he made the purchase. He says that, when he went to see McGannon, m Wheeling, to enquire about making a purchase of the land, McGannon “at once stated that he had the prettiest farm to sell, and recommended it so highly for its excellence that the said Robert was induced to accompany the complainants .to this county to look at it;” that when they reached the farm, which was on the 9th of February, 1868, “the land was then entirely covered with snow and ice, and it was imoossible to examine, ni-even to see, the soil, so as to form a judgment of its quality. But the most positive assurance was then (as well as at other times) given by the complainants to the defendant, Robert, of its great fertility and value; they asserted that it was good limestone land, was rich, and could not be beat; and one of them alleged that he had dug into the ground two spades deep, without reaching the bottom of the rich upper soil;” that “he relied entirely upon their statements with respect to it, believed them to be true, and being pleased with the exposure or lay of the land, he, in his wife’s name, agreed to purchase it.”
These are all the allegations of fraudulent misrepresentation contained in the answer, and being affirmative averments, the necessity of proving them, of course, devolved on the defendants. The only testimony in the cause tending to prove them is the deposition of Robert White himself, who says: “We walked over the land on which I now live and through the snow, and they showed me land which they represented as theirs and belonging *to that portion for which I bargained, and which land I afterwards found out did- not belong to them at all, but belonged to William McIntyre. We then examined the houses and barn, and found the barn in a bad condition, wanting a new roof; the houses were in a better condition. They also represented it as good land, and said there was plenty of limestone on it for the use of the place. He recommended me to William McIntyre to find the limestone, lie (McGannon) never having shown it to me. I have looked all over the place, and have not been ‘able to find any limestone; there is plenty of rock. Mr. McGannon represented it to me to be very rich land; he told me that he had dug two spades deep, and that he had not gotten to the bottom of the soil. The ground was so completely covered with snow that I could not see the soil. I did not see a foot of land at that time that was bare; it was all covered with snow. I think there is fifty or sixty acres of the cleared land that will hardly produce anything, it is so poor. There is no soil on it; is all slate and gravel. They represented it before and at the time of the purchase to be good land, and said there was no poor land on it. McGannon remarked that there was not a foot of poor land on it, and said he had dug two spades deep and had not come to the bottom of the soil. Mr. Mc-Gannon recommended it to me very highlv in Wheeling before I came on to see it. This occurred at his own house in Wheeling. He explained to me the situation of it. He said it was excellent good land. There was no one present that I know of. Mr. McGannon then showed me a plat of the land by a newspaper, and said it was good land.”
On the other hand, we have the testimony both of McGannon and Bennett in regard to these alleged misrepresentations. McGan-non denies what is said in the deposition (but not in the answer) of White about representing *certain land to be a part of the land sold, which was not, in fact, a part of it; and being asked. “Please describe how you represented this land to White when selling it to him; did you speak of it as limestone land, and did you represent it as two spades deep of rich soil?” he answered: “I never did describe it as limestone land, and never did represent it as two spades deep of rich soil to any one in my life.” In answer to other questions he said: “I bought the land from the McIntyres on the 3d of January, 1868, and I came to Winchester on the night of the 3d or on the morning of the 4th. I never saw the land from that day until the day we went to sell it to Mr. White. When we bought the land from McIntyre it was covered with snow, and the day the land was sold to Mr. White there was snow on a part of it, but there was some of it on which there was no snow.” Bennett, in his deposition, savs: “I had no conversation with Mr. White until the time of the sale, concerning the sale of the land, except at one time he asked me how it looked, when I told him it was a very pretty farm.” In answer to another question, he says: “I never represented the land to Mr. White. All I ever said was that it was a nice farm. I never made such representations (as are mentioned in the question, being those alleged in the answer), to either Mr. or Mrs. White. I never heard McGannon make any such representations ; nor did Mr. White ever ask me.” Being asked: “In pointing out the land to White, was not some spoken of as belonging to the part he would get, which is outside of the lines?” he answered: “I never said a word. It was the first time I had been on the land, and he knew as much of the lines as I did. I was out there when it was bought *517 by McGannon and myself, but was not on the land. To my knowledge, I never heard McGannon say anything about it; but we told him we would sell him 200 *acres off the south end of the farm.” And in answer to another question, he says: “I remember hearing McGannon in Wheeling tell White he would not sell land to his father without his seeing it.”
Now, we must take these three depositions of the parties all together, or we must disregard them all in considering the case. If we disregard them all, then, of course, there is no testimony to sustain the allegations of fraudulent misrepresentation contained in the answer. If we take them all together, then, of course, the depositions of the plaintiffs, McGannon and Bennett, which directly contradict the deposition of the defendant, Robert White, in regard to such of the said allegations as are material, must outweigh that deposition, there being two witnesses to one, and there being nothing in the case to detract from the credit due to any one of these three witnesses more than from the credit due to any other of them; so that in either view the effect is the same.
In regard to the land which Robert White testifies was represented by the vendors to be part of the land sold by them to him, but which is outside of their lines, and which is contradicted by the testimony both of McGan-non and Bennett, there is no allegation in the answer of any misrepresentation in this respect; there is no testimony to show that the portion of land in question is any better or more desirable than any of the land included in the survey of 200 acres, and when that survey was made White, though present, and though Bennett also was present, made no objection to it for not embracing the said portion of land, and set up no claim to it, thus showing that the claim set up for the first time in his deposition is an after and a very recent thought.
I think there is nothing in the record which warrants the belief, and certainly nothing which would warrant a ^decision that these vendors, McGannon and Bennett, made any representation to Robert White in regard to the land sold by them to him, which they knew to be false, or which they did not believe to be true. In regard to the alleged representation of McGannon as to the good quality of the land, there is evidence in the record strongly tending to show that such was his opinion of it, whether it was founded on what he heard from others when he made the purchase, or from the slight examination he then made of the land, or from both together. It appears from the testimony in the cause that he expressed such an opinion after the sale, when he had no apparent motive for making a misrepresentation on the subject, and under circumstances which strongly tend to show the sincerity of his opinion.
Philip Bohrer, a witness for the defendants, being asked to state whether he had ever heard McGannon and Bennett, or either of them, represent this land as of fine quality, and if so under what circumstances, says: “I have heard Mr. McGannon speak very highly of it, saying it was deep soil; that you could spade two feet deep and not come to slate or rock; that the soil was two feet deep and not a foot of poor ground on it. This conversation occurred in a general conversation between us on the subject of farming; it was in April or May, 1868.”
The witness says he did not believe this statement of McGannon to be correct, and told him so at the time. The witness was fifty years of age, was acquainted with the land, had been raised within two miles of it, and known it all his life. He was also a farmer. McGannon could not have intended to deceive this man, and could not have expected to be able to do so. Being himself a butcher by trade, the presumption is that he knew little or nothing of the quality or value of land, and really thought the land in question was what he thus represented it to be. *The witness further states that similar conversations occurred on several occasions. As to spading two feet deep and not coming to slate or rock, that may well have been actually done, and no doubt could be easily done in many places on the land. There was a valuable meadow upon the land, and about fifty acres of the land appears to be very good. Upon a part of it White admits that he made as much as two hundred bushels of wheat from between thirteen and fourteen sowed; which was certainly a very extraordinary product, though the year was a good ene and the land was heavily manured.
J. G. Omps, another witness for the defendants, and who has known the land all his life, says: “I met McGannon in the spring 1868, and was talking about the land. I gave him poor encouragement about it, but he said there was not a foot of poor land on the entire place.”
It does not appear that McGannon and Bennett, or either of them, made any representation in regard to the land on which they intended that White should rely, or on which White intended to rely, in making the purchase. If such intention had existed, the presumption is the- parties would have saved themselves the trouble and expense and loss of time of the trip from Wheeling to see the land before they made the contract. The vendors, or at least one of them, expressly refused to sell on representation and insisted that the purchaser should visit the land and see and judge for himself. The vendors may have been so thoroughly impressed with their idea of the actual value of the land, that they did not doubt that it would stand the test of the closet examination. At all events they determined, and the purchaser determined, that the sale, if made, should be made, not upon representation, but upon the view of the land by the purchaser. They accordingly set out together from ^Wheeling to visit and view the land. All the testimony agrees in the fact that during their long journey together by railroad, from Wheeling to Martinsburg and thence *518 in an ambulance to the land, not a word was said by one to another of them about the land; nor was a word interchanged between them on the subject until the morning after they reached the land. Until'then the time had not come for negotiation, and not then until White had examined the land to his entire satisfaction. In the morning, after their arrival, he commenced that examination in their presence and with their assistance. He examined the land and examined the buildings as long as he chose to do so, and was invited by McGannon to make inquiries in regard to the land of one of the McIntyres, who it seems had been one of the former proprietors of the land and knew all about it. It is said there was snow on the ground and White could not well examine the land. But was White compelled to examine the land when the snow was upon it? Could he not have deferred his visit until the snow had melted? Did either of the vendors propose that he should make it before? On the contrary, it appears that at McGannon’s suggestion the visit was delayed for a while in consequence of the snow. The probability is, that White, having sold his house in town, and desiring as soon as possible to purchase a place in the country, hastened the visit for his own accommodation. I-Ie might have taken as much time as he chose and several days,.if necessary, to make examination and inquiry. After spending some time (he says two hours) in viewing the land and improvements and making some inquiry of Mr. McIntyre, he announced to the vendors that he was satisfied and was then ready to negotiate with them for the purchase of a portion of the land. The parties being thus confronted with each other on equal terms, they then commenced *their dealings at arm’s length, each of course desiring, and having a lawful right, to make the best bargain in- his power, taking care to practice no fraud in making it. A vendor is expected to commend his wares and express the most favorable opinion of them in his power, consistently with truth, and he has a lawful right to do so. A vendee is rarely misled by such commendation and opinion, and knows that due‘’allowance must be made for the influence of self-interest. And he uses such arguments on his side as may help him to make a good bargain. It is the legitimate right of a vendor to sell at the highest price he can, and of a vendee to buy at the lowest price he can, the parties being competent to act for themselves and not under any undue influence, and taking care to act fairly in their dealing with each other. It does not appear in this case that these parties did not thus deal with each other in making the contract in question. It does not appear that the vendors were guilty' of any fraud in making it. Fraud is never to be presumed, but must always be clearly proved. It will never be inferred or conjectured from a fact or circumstance which may be consistent with innocence, even though it may be a ground of suspicion.
The parties being ready to negotiate for a sale and purchase of a part of the farm on which they then stood, the defendant, Robert White, proposed to purchase of the plaintiffs 150 acres of land, to be laid off at the southern end of their farm, embracing all the most valuable improvements on the farm, and inquired of them the price at which such purchase could be made. They answered that they would be unwilling to sell less than 200 acres, being about one-fourth of their farm. White then inquired what they would take for 200 acres, to be laid off, and embrace the improvements as aforesaid. After consulting with each other, they said they would *take $35 per acre; to which price he objected as being too high. McGan-non then said that White could have the land at $32.50, even though he (McGannon) might have to 'pay Bennett $250. White accepted this offer, and a written contract was entered into, and signed'and sealed by the parties accordingly, embracing all the terms and stipulations which they intended should constitute their contract. Rooking to all the circumstances of the case as they appear in this record, we cannot say that there was any great disparity between the price which the vendors agreed to take for the land sold to White, and the price they gave for the whole farm, having due regard to the average value per acre of each. They had bought the whole, no doubt, as a home for themselves, and they were asked to sell one-fourth and the best part, with all the best improvements on the farm. Of course they desired, and had a right to ask, such a price as would, in their opinion, fully indemnify them from loss, or even increase the supposed advantage of their purchase.
I think, therefore, that the alleged fraud and misrepresentation are not sustained by the evidence, and'that no sufficient defence to this suit is afforded by that ground, whether taken alone or in connection with the alleged inadequacy of consideration.
Upon the whole, I am of opinion that the appellees are entitled to a specific execution of the contract in question, and that the decree appealed from ought to be affirmed.
I do not express any opinion in this case as to. the competency of the parties thereto as witnesses. In considering the case, I have treated the testimony of the parties as constituting a part of it; because it must necessarily be so treated to sustain the pretensions of the appellants. They cannot succeed, at least without the testimony of *themselves, the competency of which cannot be maintained without admitting the competency of the testimony of the appellees. No such question is presented in the petition of appeal in the case; and in the printed brief of the appellants’ counsel he refers to and relies on the deposition of one of the appellee's as a part of the testimony in the’ case.
I do not consider it necessary that the title to said tract of 200 acres should have been referred to a commissioner for investigation, before decreeing a specific execution of the same. The suit was instituted on the 12th of April, 1869, and the decree appealed from was rendered o» the 5th of April, 1875. Dur *519 ing the long period of the pendency of the suit no question was ever raised by the appellants as to the title to the land. A deed with general warranty of title from the ap-pellees to the appellant, Frances White, conveying the said 200 acres of land and a release of the only incumbrance thereon which was supposed to be in existence, both duly certified for record, were filed as exhibits with the bill in this case in May, 1869. And in the decree appealed from it was decreed that said deed and release should be taken from the papers and recorded, leaving copies thereof in place of the originals. Under these circumstances, 1 think it would be unjust to delay any longer the specific execution of the contract for the purpose of having a reference to a commissioner as to the title.
fn regard to the complaint made that the circuit court erred in not requiring security for costs of the appellees, as non-residents of the state, I think that was a question for the circuit court to decide, and that the decision is not subject to revision by this court on this appeal. But if it were, I think there is no error in the decision.